## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MODERN PERFECTION LLC and FRUITFUL BEAR, LLC, individually and as representatives of a class of similarly situated persons, | Case No.: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

Plaintiffs, Modern Perfection LLC ("Modern Perfection") and Fruitful Bear, LLC ("Fruitful Bear") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this class action on behalf of themselves and a proposed class and subclasses of all others similarly situated (the "Class"), against Defendant, Bank of America, N.A. ("Bank of America" or "Defendant"). Plaintiffs make the following allegations based upon personal knowledge as to themselves and their own experience, and upon information and belief as to all other matters, based upon the investigation undertaken by their counsel, public records, and online positing and articles, among other materials.

## I.    INTRODUCTION

1.    In response to the extraordinary public health and economic impact caused by the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, H.R. 748 ("CARES Act"), which the President of the United States signed on March 27, 2020, to provide relief to Americans and American businesses suffering from the resulting health and economic crisis.

2.      Among its provisions, the CARES Act established the Paycheck Protection Program ("PPP"), a $669-billion business loan program to assist certain businesses, self-employed workers, sole proprietors, certain nonprofit organizations, and tribal businesses retain and continue to pay their workers in the midst of safety measures being undertaken by various federal, state, and local governments in response to the spread of COVID-19, although some other operating expenses would qualify as well.[1]   The PPP was intended to provide economic relief to small businesses nationwide adversely affected by the COVID-19 pandemic, and the terms of its loans were generous, with a 1% interest rate and a two-year maturity.

3.      The PPP provided for forgiveness of up to 100% of the principal and accrued interest of qualifying loans guaranteed thereunder, as long as certain conditions regarding the use of funds were met.  To qualify for loan forgiveness, certain employee and compensation levels had to be maintained, and the PPP loan proceeds must have been used for payroll costs and, up to a certain percentage of the loan, mortgage interest, rent, and utility expenses.  A business could apply for loan forgiveness at any time on or before the loan's maturity date.  The actual amount of forgiveness would depend, in part, on the total amount of payroll costs and mortgage interest, rent, and/or utility payments incurred, over the eight-week period following the date of the loan.

4.      The PPP was implemented and fully backed by the federal Small Business Administration ("SBA"), with support from the U.S. Department of the Treasury, and loans were processed and made through eligible private lenders, including federally insured banks and credit unions and other SBA-approved lenders.  Loan applicants submitted their information,

---

[1] The PPP was initially allocated $349 billion in March 2020 but was supplemented with an additional $320 billion in April 2020.

documentation, and certifications to those eligible private lenders on standard forms provided by the SBA or substantially similar forms created by the private lenders.

5.    Private lenders were compensated for processing the applications and facilitating the PPP loans.  Doing so was profitable for them, as they received a commission under the CARES Act of 5% for loans of not more than $350,000, 3% for loans between $350,000.01 and $1,999,999.99, and 1% for loans of at least $2 million.  Lenders were also required under the CARES Act and accompanying regulations to underwrite the loans they originated, which responsibilities included verifying the documentation submitted by borrowers and confirming the dollar amount of average monthly payroll costs as defined under the PPP.  As such, lenders like Bank of America were required to confirm and verify the amount of any loans disbursed under the PPP prior to disbursement of any funds under the program.

6.    Bank of America was the second largest private lender that originated PPP loans, and, according to its 2021 Form 10-K filed with the United States Securities and Exchange Commission, originated $35.4 billion through more than 300,000 loans, meaning that Bank of America received a minimum of $354 million in commissions for loan issuance or a maximum of $1.77 billion.  To secure its massive commissions, Bank of America directly and aggressively marketed and solicited small businesses to apply for PPP loans through Bank of America, which were made pursuant to the CARES Act under the PPP (the "Loan(s)"), as embodied in the promissory notes between Bank of America and Plaintiffs and Class members (the "Promissory Notes").  But, as many of those businesses found to their detriment, the Loans that Bank of America secured on their behalf were significantly larger than that the amounts they qualified for under the PPP.  Instead of principal and interest being fully forgivable as represented in Bank of America's communications and Promissory Notes, small business owners were instead on the

hook for tens of thousands of dollars, or more, that Bank of America had wrongly represented were fully forgivable—plus interest.

7.     More specifically, and as alleged in further detail below, unlike Form W-2 worker ("W-2 Worker") payroll expenses, payroll expenses attributed to 1099-MISC workers ("1099 Workers") could not be used to calculate the business's Loan eligibility.  Nevertheless, Bank of America instructed small business owners to include such pay in their loan applications to calculate their maximum Loan eligibility, and then subsequently included those 1099 Worker expenses when securing Loans for those amounts.  At no time did Bank of America inform or clarify to these businesses that 1099 Worker expenses could not be used to calculate their Loan eligibility, nor did Bank of America disclose that Loans used to pay 1099 Workers were not forgivable.  As a result, many businesses, including Plaintiffs and the members of the Class, relied on Bank of America's actions and statements to apply for Loans through Bank of America and in using such funds to retain and pay their 1099 Workers as Bank of America instructed was permissible.

8.     When Plaintiffs and Class members later applied for forgiveness of their Loans through Bank of America, Bank of America rejected those applications on the basis that 1099 Workers payroll expenses were not—contrary to its calculations and representations at the time the businesses applied for their Loans through Bank of America—qualifying "payroll" expenses under the PPP.  To their surprise, Plaintiffs and Class members found themselves, contrary to the terms of their Promissory Notes with Bank of America, liable for repayment of the portions of their Loans that they used to pay their 1099 Workers.  Had they known that payments to 1099 Workers did not qualify for PPP loans and/or would not qualify for forgiveness under the PPP, Plaintiffs and the Class would not have applied and taken a Loan, would have reduced the amount of the Loan they applied for, and/or would have allocated their Loan funds differently.

9.      Accordingly, Bank of America's misrepresentations and misconduct have unjustly enriched Bank of America and have harmed Plaintiffs and Class members to the tune of billions of dollars, and Plaintiffs seek, on behalf of themselves and the Class, damages, restitution, and injunctive relief for Bank of America's: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) common law fraud; (4) fraud in the inducement; (5) negligent misrepresentation; and (6) violations of the North Carolina Deceptive Business Practices Act ("NCDTPA"), N.C. Gen. Stat. §§ 75-1 et seq.

## II.    JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) because: (i) there are 100 or members of the Class; (ii) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (iii) at least one member of the Class is a citizen of a state different from Defendant.

11.     This Court has personal jurisdiction over Defendant because Defendant is authorized to do business and regularly conducts business throughout the United States, including in Maryland.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, Defendant is authorized to conduct business in this District, and Defendant regularly conducts and transacts business in this District and is therefore subject to personal jurisdiction in this District.

## III.   THE PARTIES

### A.     Plaintiffs

#### 1.     Modern Perfection

13.     Modern Perfection is a Maryland Limited Liability Company with its principal place of business in Towson, Maryland.

14. Modern Perfection provides professional home interior remodeling services and specializes in bathroom and kitchen remodeling and flooring services in the Lutherville-Timonium, Maryland area.

### 2. Fruitful Bear

15. Fruitful Bear is a Washington limited liability company with its principal office located in Centralia, Washington.

16. Fruitful Bear is a home renovation business.

### B. Defendant

17. Bank of America is a national bank with its headquarters and principal place of business located in Charlotte, North Carolina. Among other things, Bank of America is engaged in the business of providing banking services to small businesses, including Plaintiffs and members of the Class. Bank of America is also one of SBA's preferred lenders for small businesses under the SBA's 7(a) loan program, which is the SBA's primary program for providing financial assistance to small businesses.

## IV. FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A. The PPP Loan Provisions

18. On March 27, 2020, the President of the United States signed the CARES Act, which Congress passed to remedy the sudden economic shock from the lockdowns imposed across the United States to combat the COVID-19 pandemic. The CARES Act, *inter alia*, set aside $669 billion under the PPP to be administered by the SBA, for businesses to maintain their payrolls.

19.     Generally, PPP Loans were available to businesses: (a) with 500 or fewer employees whose principal place of residence is in the United States;[2] (b) considered a "small business concern" as defined under the Small Business Act, 15 U.S.C. § 632 or a tax-exempt nonprofit organization or Tribal business concern pursuant to the Internal Revenue Code; and (c) in operation on February 15, 2020, and either had W-2 or 1099 workers or were self-employed. *See* 85 Fed. Reg. 20812.  Qualifying businesses were permitted to borrow up to 2.5 times the applicant's qualifying monthly payroll costs with a two-year maturity period.  *See* 85 Fed. Reg. 20811, 20812.  Among other things, an employee's compensation in excess of an annual salary of $100,000 and any amounts paid to a 1099 Worker did not qualify as "monthly payroll costs" under the PPP.  *See id.* at 20812.

20.     These PPP loans would also be subject to partial or complete forgiveness, including both interest and principal, if the borrower used all of the loan proceeds on qualifying "payroll" costs, payment on mortgage, rent, and utility obligations incurred before February 15, 2020, provided that non-payroll costs could only be attributable to up to 25% of the loan forgiveness amount and employee and compensation levels are maintained, which amount attributable to non-payroll costs was later extended to 40%.  *See id.* at 20813; Paycheck Protection Program Flexibility Act of 2020, H.R. 7010, Pub. L. No. 116-142, 134 Stat. 641 (June 5, 2020).

21.     All SBA 7(a) lenders, including Bank of America, were automatically approved to make PPP loans, which had a two-year maturity and were fixed at interest rates of 1%, completely guaranteed by the United States government, and which did not require any collateral or personal

---

[2] There were size exceptions for businesses operating in "certain indust[ries]" that met "the applicable SBA employer-based size standards for that industry."  Business Loan Program Temporary Changes; Paycheck Protection Program - Interim Final Rule, SBA, 85 Fed. Reg. 20812 (Apr. 15, 2020).

guarantees from the borrower. *See id.* at 20816. In exchange for their services in making and processing the PPP loans, the SBA provided the following fee rates to the lenders: (a) 5% for loans of not more than $350,000; (b) 3% for loans of more than $350,000 and less than $2,000,000; and (c) 1% for loans of at least $2,000,000. *See id.* at 20816.

22.     The SBA authorized lenders to rely on the applicant's certifications and documentation for loan eligibility and forgiveness determinations, without any exposure to liability if those certifications or documentation turned out to be false, while the loans were completely guaranteed by the SBA. *See id.* at 20812, 20815, 20816. Nevertheless, lenders were still required to, among other things: (a) "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020"; and (b) "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application." *Id.* at 20815.

23.     In sum, PPP lenders received effectively risk-free fees for each loan they originated so long as they actually reviewed and confirmed the certifications and documentation submitted by applicants and the dollar amount of average monthly payroll costs for calculation of the qualifying PPP loan amount. Given these very favorable terms, lenders had strong incentives to originate as many PPP loans as possible.

24.     Bank of America knew, no later than publication of the April 15, 2020 interim final rule, that 1099 Workers did not count as employees for purposes of Loan calculations. Nevertheless, Bank of America told borrowers that they did.

**B.    Bank Of America's Application And Loan Terms Indicated That 1099 Worker Expenses Were Covered Under The PPP**

25.    Once the CARES Act was signed into law and the PPP came into effect, Bank of America promptly began soliciting its clients for Loan applications.  Initially, Bank of America focused on larger small businesses that had a significant commercial lending relationship with Bank of America.  Given the CARES Act and PPP focus on assisting small businesses, Bank of America quickly came under fire for its preferential treatment of larger small businesses.  Faced with a public relations nightmare, Bank of America quickly reversed course and began aggressively soliciting smaller small business clients.

26.    Starting no later than on or about March 30, 2020, Bank of America started advertising to and soliciting its small business clients, including Plaintiffs and Class members, to take out PPP loans through Bank of America and instructing them to gather their records of their employees for 2019, explicitly including in that definition 1099 Workers.

27.    When small businesses went to apply for a Loan through Bank of America through Bank of America's online portal, on each application, the bank required each applicant to certify, in pertinent part, the following:

- o    The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes ***or paid independent contractors, as reported on Form(s) 1099-MISC***. (emphasis added).

- o    Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

- o    The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly

used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

o   The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

o   I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

28.    After borrowers submitted their application for a Loan to Bank of America, Bank of America directed borrowers via form e-mail to "[g]ather documentation about [their] small business that may be needed, including . . . independent contractor costs for 2019."

29.    Bank of America also told borrowers that they "**must** submit," "Form 1099-MISC for 2019, for services rendered as an independent contractor" for review by Bank of America in connection with their Loan applications.

30.    When Plaintiffs and Class members submitted their applications and uploaded their documentation, including in reliance on Bank of America's representations, their 1099-MISC forms, Bank of America promised to "review the uploaded documents and contact [potential borrowers] if further clarification or documentation is necessary."  Bank of America also told Plaintiffs and Class members, *inter alia*, "[o]nce you've uploaded the required information, Bank of America *will confirm your information* and submit it to the Small Business Administration for Approval."  (emphasis added).

31.     After Bank of America purportedly reviewed the documentation submitted by Plaintiffs and Class members and confirmed the information contained therein, and in their applications, Bank of America either requested additional documentation, modified the loan amount, or approved the loan as set forth in the application.  In connection with the Loan applications, Bank of America also issued Promissory Notes for the Loans.  As in all prior representations, the Promissory Notes defined qualifying payroll costs to include payments made to 1099 Workers, stating in relevant part:

> REPRESENTATIONS, WARRANTIES AND COVENANTS.  (1) Borrower represents and warrants to Bank, and covenants and agrees with Bank, that: . . . (ix) Borrower was in operation on February 15, 2020 and had employees for whom Borrower paid salaries and payroll necessary to support the ongoing operations of Borrower. (xi) All proceeds of the Loan will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule and Borrower acknowledges that if the funds are knowingly used for unauthorized purposes, the federal government may hold Borrower and/or Borrower's authorized representative legally liable, such as for charges of fraud. (xii) Borrower has provided Bank true, correct and complete information demonstrating that Borrower had employees for whom Borrower paid salaries and payroll taxes on or around February 15, 2020. (xiii) Borrower has provided to Bank all documentation available to Borrower on a reasonable basis verifying the dollar amounts of **average monthly payroll costs for the calendar year 2019, which documentation shall include, as applicable, copies of payroll processor records, payroll tax filings and/or Form 1099-MISC**. (xiv) Borrower will promptly provide to Bank (a) any additional documentation that Bank requests in order to **verify payroll costs** and (b) documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight week period following the Loan. (xv) Borrower acknowledges that (a) **loan forgiveness will be provided** by the SBA for the sum of **documented payroll costs,** covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs.

Bank of America, Promissory Note (emphases added).

32.     The Promissory Notes issues by Bank of America and signed by Plaintiffs and Class members were substantially identical in all aspects material to this issue.

33.     These terms written by Bank of America not only mirrored the certifications it required at the time of application, but stated that Bank of America would "verify" the borrower's calculation of a borrower's "payroll" costs, including "the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs," to confirm and verify the applicant's eligibility.

34.     Ultimately, in contradiction of the SBA's instructions and federal regulations, Bank of America calculated each borrower's eligibility and loan amount based on the borrower's payroll inclusive of both W-2 and 1099 Worker expenses and provided purportedly forgivable Loans based on those calculations.  In so doing, Bank of America knew or should have known that it provided false and misleading information to Plaintiffs and Class members, and to the Small Business Administration, in its efforts to increase its commissions.

**C.      Bank Of America Rejects Loan Forgiveness Applicants Whose Loan Amounts Were Calculated Based On Pay To 1099 Workers And Breaches Their Contractual Representations And Obligations**

35.     On or about December 2020, after the initial shock of the COVID-19 pandemic had passed, Bank of America began inviting its Loan clients to apply for forgiveness.

36.     However, when borrowers like Plaintiffs and Class members, who, at Bank of America's explicit direction, used 1099-MISC forms to substantiate their Loan amount, went to Bank of America's portal to request loan forgiveness, they were unable to request forgiveness.  For many, it was not until after months of back and forth with Bank of America on their forgiveness applications that Bank of America confronted them with a declaration that their loans were not forgivable, or were only forgivable in nominal amounts, such as $1, instead of, in many cases, the tens of thousands of dollars, or more, that Plaintiffs and Class believed, based on their Promissory

Notes and other Bank of America representations, to have been forgivable. That is, Bank of America did not even allow Plaintiff and Class members to submit their own forgiveness applications and documentations evidencing their compliance with the forgiveness criteria, instead unilaterally determining that borrowers were not entitled to forgiveness and directing Plaintiff and Class members to appeal that determination with the SBA. Even where borrowers actually used PPP proceeds for qualifying payroll costs attributable to W-2 workers, Bank of America did not allow them to apply for forgiveness. Unlike most other large banks, Bank of America also did not register with the SBA to enable its borrowers to use SBA's direct forgiveness portal, meaning that Bank of America actually inhibited borrowers from applying for Loan forgiveness directly.

37.    In so doing, Bank of America has revealed its misrepresentations in inducing Plaintiffs and Class members to secure Loans through Bank of America. Bank of America has also breached its contractual representation that 1099 Worker expenses were considered "payroll" under the PPP and thus forgivable, breached its contractual obligation to verify the borrower's documentation to verify the number of workers and worker compensation that qualified as "payroll" under the PPP, and breached the implied covenant of good faith and fair dealing by providing purported Loans to borrowers in material excess of the amounts they actually qualified for under the PPP.

38.    In addition, Bank of America has violated the applicable SBA regulations, which required that it: (a) confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020; and (b) confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application.

39.     Bank of America knew that the loan amounts it certified to the Small Business Administration were fraudulent, though it did not disclose that information to Plaintiffs and Class members until they sought forgiveness for their Loans.  Indeed, in a February 18, 2022 e-mail to a small business owner, Bank of America's Assistant General Counsel and Senior Vice President seemingly admitted the fraud, writing, *inter alia*:

> Bank [of America] is subject to the False Claims Act, which creates liability for any person or entity who knowingly submits a false claim to the government or causes another to submit a false claim to the government or knowingly makes a false record or statement to get a false claim paid by the government.  The Bank must examine all submissions to the SBA PPP loan program in line with the False Claims Act and ensure the documentation the Bank submits on behalf of borrowers supports the claims for funds under the terms of the program.  The Bank cannot submit a forgiveness application in amount greater than the amount provided for under the SBA PPP guidelines.

> On January 15, 2021, the SBA issued lender guidance stating a borrower may not receive PPP loan forgiveness for any amount that exceeds the "correct maximum loan amount" under the CARES Act and Economic Aid Act. (https://www.sba.gov/sites/default/files/2021-01/5000-20078-508.pdf)  "This is true whether the excess loan amount was caused by **borrower error or lender error**." *Id.* (emphasis added.)  A borrower's correct maximum loan amount is calculated based on the documents provided in connection with the borrower's first-draw PPP loan application. Even if the borrower spent the money received on eligible expenses, if the borrower received more money than it was qualified for, that excess amount would not be forgiven.

> \*     \*     \*

> "Lenders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll costs.  For example, minimal review of calculations based on payroll report by a recognized third-party payroll processor would be reasonable . . . . If the lender identifies errors in the borrower's calculation or material lack of substantiation in the borrower's supporting documents, the lender should work with the borrower to remedy the issue." (citing the SBA PPP Frequently Asked Questions).

40.     The February 18, 2022 correspondence also admitted that payments to 1099 Workers were never, in fact, qualified payroll costs, despite Bank of America's representations in its solicitations, representations, and Promissory Notes.

41.     The e-mail correspondence effectively admitted that Bank of America had a duty under both the False Claims Act and under the CARES Act to confirm the Plaintiffs' and Class members' qualifying loan amount calculation and review the borrower's supporting documentation but failed to do so.

42.     Further, perhaps in an effort to cover up its wrongdoing, Bank of America now has removed its PPP application portal from online access.  Plaintiffs and Class members are no longer able to access their loan applications, Promissory Notes, or supporting documentation.

43.     If Class members fail to make payment on their loans because Bank of America promised that the loan amounts were forgivable, Bank of America reports them as delinquent on their Loans to the SBA.  A delinquent credit mark through the SBA makes it difficult for businesses to receive additional funding and threatens the viability of those businesses as a going concern.

44.     Despite the fact that Plaintiffs and Class members followed Bank of America's instructions when applying for their PPP Loans and complied with the terms of the Promissory Notes, Bank of America has threatened Class members with criminal prosecution for fraud in connection with their loan and forgiveness applications.

45.     Bank of America is also harassing Plaintiffs and Class members with phone calls, e-mails, and other correspondence seeking payment on these loans to which it is not entitled under the Promissory Notes and based on its own representations.

**D.    Plaintiffs' Experiences**

**1.    Modern Perfection**

46.    Modern Perfection maintains a business depository account with Bank of America.

47.    In or about March 2020, Modern Perfection received solicitations from Bank of America to apply for a PPP Loan through the bank.

48.    On or about April 20, 2020, Modern Perfection applied for a Loan with Bank of America by completing Bank of America's standard online Loan application, including the required certifications described herein.  One of those certifications required Modern Perfection to certify that it "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes *or paid independent contractors, as reported on Form(s) 1099-MISC*." (emphasis added).

49.    After submitting the application, Bank of America requested additional information, and on or about April 20, 2020, Modern Perfection provided Bank of America with its W-2s and 1099s Tax Return filings and Schedule C for 2019.

50.    On or about April 27, 2020, Modern Perfection completed and signed Bank of America's attestation form and form Promissory Note through Bank of America's online portal.

51.    On or about April 28, 2020, Bank of America informed Modern Perfection that its Loan had been approved, and funds would be deposited into its account within 1-2 business days.

52.    Modern Perfection's Loan was funded in the full amount requested of $37,500.

53.    Modern Perfection used the Loan proceeds such that the substantial majority, if not all, of the Loan amount was subject to forgiveness under the terms of the Promissory Note and representations made in connection with Modern Perfection's Loan application.

54.    On or about June 3, 2021, Bank of America informed Modern Perfection that only $179 of the $37,500 Loan was eligible for forgiveness.  Specifically, on June 3, 2021, Bank of

America informed Modern Perfection: "Based on SBA rules and the documentation you provided in your original application, your correct maximum loan amount (and, therefore, the maximum amount of forgiveness you can receive) is less than the funding you received in connection with your first PPP loan."

55.    In or about November 2021, Modern Perfection logged into the online portal to apply for forgiveness of the entire Loan amount.  However, Bank of America's online form had prepopulated the amount of forgiveness for which Modern Perfection could apply—$179.  The form did not allow Modern Perfection to change the forgiveness amount.

56.    Modern Perfection submitted the forgiveness application, because Bank of America asserted that was the only way it could seek to appeal the forgiveness amount.

57.    On or about March 3, 2022, Bank of America provided Modern Perfection with the option of extending the Loan term from two years to five years, which would result in lower monthly payments, but result in Modern Perfection paying additional interest over the life of the Loan. Modern Perfection had no choice but to agree to the extension given that the alternative was that the full amount of the Loan, minus the $179 that Bank of America said was forgivable, was otherwise immediately due and owing.

58.    To date, Modern Perfection has not received forgiveness for the amount represented in the Promissory Note to be forgivable and has suffered damages in the form of the difference between the amount that the Promissory Note presented was forgivable and the amount that Bank of America actually determined was forgivable, as well as interest on those amounts.

59.    Modern Perfection based its decision to enter into the Promissory Note for the Loan in the amount of $37,500, in part, on (a) Bank of America's representations that (i) payroll expense attributed to 1099 Workers were qualifying "payroll costs," and (ii) if at least 60% of the loan

proceeds (from Loans calculated using payroll expenses attributed to 1099 Workers) were used to pay 1099 Workers, then the Loan was forgivable under the PPP; (b) the Promissory Note's definition of "average monthly payroll costs," to include "as applicable, copies of payroll processor records, payroll tax filings *and/or Form 1099-MISC*; and (c) the Promissory Note's representation that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs," which was later increased to 40%.  (emphasis added).

60.     These false statements and misrepresentations were material to Modern Perfection's decision to apply for and take out the Loan, to include payroll expenses attributed to 1099 Workers in its calculation of average monthly payroll costs, to apply for the Loan in the amount that it did, and to allocate the Loan funds in the way that it did.

61.     These misrepresented, concealed, and suppressed facts were material to Modern Perfection's decision to apply for the Loan and sign the Promissory Note because Modern Perfection expected, based on Bank of America's guarantees in its solicitations and Promissory Note, that the Loan was forgivable if all other requirements for forgiveness were met.

62.     Modern Perfection actually, reasonably and justifiably relied on Bank of America's representations in deciding to enter into the Promissory Note because of, *inter alia* (a) Bank of America's superior knowledge concerning the PPP program, (b) Bank of America's representations that it would confirm and verify the loan amounts and documentation, and (c) its prior banking relationship with Bank of America as a small business client with a business depository relationship.

63.    Modern Perfection reasonably relied on Bank of America's representations that its payments to 1099 Workers were qualifying and forgivable payroll costs because Bank of America represented it would confirm and verify the qualifying loan amount and all of Modern Perfection's documentation.

64.    Modern Perfection had a right to rely on Bank of America's representations in full belief of their truth because of Bank of America's superior factual knowledge, as compared to its own, because Bank of America affirmatively represented it would review loan documentation and confirm and verify the qualifying loan amounts, and because Bank of America knew Modern Perfection was relying on Bank of America's superior knowledge, experience and judgment.

65.    Had Modern Perfection known that payments to 1099 Workers did not qualify for PPP loans, and/or would not qualify for forgiveness under the PPP, it would not have applied for and taken the Loan, would not have included payroll expenses attributed to 1099 Workers in its calculation of average monthly payroll costs, would not have applied for the Loan in the amount that it did, and/or would not have allocated the Loan funds in the way that it did.

### 2.    Fruitful Bear

66.    Fruitful Bear maintains a credit card account with Bank of America.

67.    In or about March 2020, Fruitful Bear received solicitations from Bank of America to apply for a PPP loan through the bank.

68.    On or about April 7, 2020, Fruitful Bear applied for a Loan with Bank of America by completing Bank of America's standard online Loan Application, including the required certifications described above.  One of those certifications required Fruitful Bear to certify that it "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or *paid independent contractors, as reported on Form(s) 1099-MISC*."  (emphasis added).

69.     Fruitful Bear completed and submitted to Bank of America all of the required documents, including, *inter alia,* its Form 1099-MISCs, the PPP Loan Amount Template, and PPP Application Addendum, with the required certifications, as explicitly requested by Bank of America.

70.     Bank of America subsequently approved the Loan, and on or about May 7, 2020, Fruitful Bear completed and signed Bank of America's form Promissory Note for a Loan in the amount of $32,927.00.

71.     On or about May 12, 2020, Fruitful Bear's Loan was funded in the amount of $32,927.00.

72.     Fruitful Bear used the Loan proceeds such that the substantial majority, if not all, of the Loan amount was subject to forgiveness under the terms of the Promissory Note and representations made in connection with Modern Perfection's Loan application.

73.     Bank of America invited Fruitful Bear to apply for Loan forgiveness, and thereafter Fruitful Bear applied for Loan forgiveness through Bank of America's online portal, including by submitting requested documentation.

74.     On or about January 7, 2022, Bank of America sent Fruitful Bear a letter indicating the SBA had determined that only $1,216.67 of its Loan (plus accrued interest) had been forgiven. In the same letter, Bank of America informed Fruitful Bear that its Loan was no longer deferred, and principal and interest payments on the remaining balance of $31,710.33 were scheduled to begin on February 12, 2022.  According to this letter, the combined monthly principal and interest payment was $8,076.95 over a four-month period.

75.     On or about January 28, 2022, Bank of America provided Fruitful Bear with the option of extending the Loan term from two years to five years, which would result in lower

monthly payments, but result in Fruitful Bear paying additional interest over the life of the Loan. Fruitful Bear had no choice but to agree to the extension given that the alternative was that the full amount of the Loan, minus the $1,216.67 that Bank of America said was forgivable, was otherwise immediately due and owing.

76.    To date, Fruitful Bear has not received forgiveness for the amount represented in the Promissory Note to be forgivable and has suffered damages in the form of the difference between the amount that the Promissory Note represented was forgivable and the amount that Bank of America actually determined was forgivable, as well as interest on those amounts.

77.    Fruitful Bear based its decision to enter into the Promissory Note for the Loan in the amount of $32,927.00, in part, on (a) Bank of America's representations that (i) payroll expense attributed to 1099 Workers were qualifying "payroll costs," and (ii) if at least 60% of the loan proceeds (from Loans calculated using payroll expenses attributed to 1099 Workers) were used to pay qualifying payroll costs as defined in the Promissory Notes, then the Loan was forgivable under the PPP; (b) the Promissory Note's definition of "average monthly payroll costs," to include "as applicable, copies of payroll processor records, payroll tax filings and/or Form 1099-MISC; and (c) the Promissory Note's representation that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs," which was later increased to 40%.

78.    These false statements and misrepresentations were material to Fruitful Bear's decision to apply for and take out the Loan, to include payroll expenses attributed to 1099 Workers in its calculation of average monthly payroll costs, to apply for the Loan in the amount that it did, and to allocate the Loan funds in the way that it did.

79.     These misrepresented, concealed, and suppressed facts were material to Fruitful Bear's decision to apply for the Loan and sign the Promissory Note because Fruitful Bear expected, based on Bank of America's guarantees in its solicitations and Promissory Note, that the Loan was forgivable if all other requirements for forgiveness were met.

80.     Fruitful Bear actually, reasonably and justifiably relied on Bank of America's representations in deciding to enter into the Promissory Note because of, *inter alia,* (a) Bank of America's superior knowledge concerning the PPP program, (b) Bank of America's representations that it would confirm and verify the loan amounts and documentation, and (c) its prior banking relationship with Bank of America as a small business client with a business depository relationship.

81.     Fruitful Bear reasonably relied on Bank of America's representations that its payments to 1099 Workers were qualifying and forgivable payroll costs because Bank of America represented it would confirm and verify the qualifying loan amount and all of Fruitful Bear's documentation.

82.     Fruitful Bear had a right to rely on Bank of America's representations in full belief of their truth because of Bank of America's superior factual knowledge, as compared to its own, because Bank of America affirmatively represented it would review loan documentation and confirm and verify the qualifying loan amounts, and because Bank of America knew Fruitful Bear was relying on Bank of America's superior knowledge, experience and judgment.

83.     Had Fruitful Bear known that payments to 1099 Workers did not qualify for PPP loans, and/or would not qualify for forgiveness under the PPP, it would not have applied for and taken the Loan, would not have included payroll expenses attributed to 1099 Workers in its

calculation of average monthly payroll costs, would not have applied for the Loan in the amount that it did, and/or would not have allocated the Loan funds in the way that it did.

## NORTH CAROLINA LAW APPLIES TO THE CLAIMS

84.    It is appropriate to apply North Carolina law to the state law claims of the Nationwide Class (defined below), because North Carolina's interest in this litigation exceeds that of any other state.

85.    Bank of America has its headquarters and principal place of business located in Charlotte, North Carolina.

86.    Bank of America's corporate-level employees are largely located in and work out of Bank of America's Charlotte, North Carolina headquarters, including its web developers and marketing team who, upon information and belief, created the forms and advertisements referenced to herein.

87.    Bank of America's office of the general counsel is located in Bank of America's Charlotte, North Carolina headquarters, including the legal counsel who, upon information and belief, created the Promissory Notes.

88.    The Promissory Notes were fully executed in the State of North Carolina when accepted by Bank of America in the State of North Carolina.

89.    The Promissory Notes state that "the charging and calculating of interest on the obligations under this Note [*i.e.*, on the Loans] shall be governed by, construed and enforced in accordance with the laws of the state of North Carolina and applicable federal law."  Central to this litigation are issues of the obligations owed and the charging and calculation of interest on the obligations under the Promissory Notes, and thus, this choice of law provision requires application of North Carolina law.

90.     Plaintiffs and Class members were injured in the state of North Carolina when Bank of America refused to submit their applications for forgiveness to the SBA from the State of North Carolina, which decision was made at its headquarters in Charlotte, North Carolina.

91.     Therefore, North Carolina has the most substantial interest in Plaintiffs' and Class members' claims and North Carolina law applies.

## V.    CLASS ALLEGATIONS

92.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring their claims against Bank of America on behalf of themselves and the follow classes:

**Nationwide Class ("Class")**

All borrowers in the United States who received a Loan from Bank of America under the Paycheck Protection Program and were denied loan forgiveness in any part because (a) they included any payments to 1099 Workers in the calculation of qualified payroll costs as part of their Loan applications and/or (b) they made payments to 1099 Workers with Loan proceeds.

**State Sub-Classes**

**Maryland Sub-Class**

All borrowers in Maryland who received a loan from Bank of America under the Paycheck Protection Program who were denied loan forgiveness in any part because (a) they included any payments to 1099 Workers in the calculation of qualified payroll costs as part of their Loan applications and/or (b) they made payments to 1099 Workers with Loan proceeds.

**Washington Sub-Class**

All borrowers in Washington who received a loan from Bank of America under the Paycheck Protection Program who were denied loan forgiveness in any part because (a) they included any payments to 1099 Workers in the calculation of qualified payroll costs as part of their Loan applications and/or (b) they made payments to 1099 Workers with Loan proceeds.

93.     Bank of America, its officers and directors, as well as the Judge to whom this case is assigned, are excluded from the Class and State Sub-Classes.

94.     **Numerosity/Impracticability of Joinder.**  The Class consists of thousands, if not tens of thousands, of entities, making joinder impractical as set forth under Federal Rule of Civil Procedure 23(a)(1).  The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records.

95.     **Risk of Inconsistent or Varying Adjudications.**  Defendant has acted, and failed to act, on grounds generally applicable to Plaintiffs and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

96.     **Commonality and Predominance of Common Questions.**  There are many questions of law and fact common to the claims of Plaintiffs and of the other Class members, and those questions predominate over any questions that may affect only individual Class members. Common questions of fact and law affecting members of the Class that predominate over any individualized questions include, but are not limited to, the following:

a.      Whether Defendant breached its contracts with Plaintiffs and the other Class members by failing to ensure that their reported payroll expenses qualified for Loans and forgiveness under the PPP;

b.      Whether Defendant breached the implied covenant of good faith and fair dealing by providing Plaintiffs and the other Class members purported Loans in material excess of the amounts they actually qualified for under the PPP;

c.      Whether Defendant breached the implied covenant of good faith and fair dealing in the loan origination process with respect to Plaintiffs and the other Class members, because Defendant failed to confirm, as was its obligation under the PPP, from the information Plaintiffs and the other Class

members provided, that they actually qualified for those Loans under the PPP;

d.  Whether Defendant engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practice in or affecting commerce under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1 *et seq.*;

e.  Whether Defendant made material misrepresentations and omissions in connection with its transactions with Plaintiffs and the Class;

f.  Whether Defendant's actions were fraudulent and negligent;

g.  Whether, as a result of Defendant's conduct, Plaintiffs and the other Class members have been injured, and, if so, the appropriate measure of damages to which they are entitled; and

h.  Whether, as a result of Defendant's conduct, Plaintiffs and the other Class members are entitled to injunctive, equitable, and/or other relief, and, if so, the nature of such relief.

97.  Absent the certification of a class, members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

98.  Class certification, therefore, is appropriate under Federal Rules of Civil Procedure 23(a) and (b)(3). The aforementioned common questions of law and fact predominate over any

question affecting individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

99.     Class certification is also appropriate pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), because Defendant has acted or refused to act on grounds generally applicable to the Class, so the final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

100.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex commercial litigation and class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of other Class members and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interests adverse to those of the other Class members.

## COUNT I
## BREACH OF CONTRACT
## (ON BEHALF OF THE CLASSES
## AGAINST BANK OF AMERICA)

101.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 100 of this Complaint, and all other Counts pleaded herein, as if fully set forth herein.

102.     Plaintiffs and Class members and Bank of America have agreed to the terms and conditions of Loans from Bank of America to Plaintiffs and Class members, which were purportedly made pursuant to the CARES Act under the PPP, as embodied in the Promissory Notes.

103.     The Promissory Notes are valid, enforceable contracts between Plaintiffs and Class members and Bank of America.

104.     The Promissory Notes were supported by valid consideration.  Specifically, in consideration of the Loans received by Plaintiffs and Class members from Bank of America,

Plaintiffs and Class members agreed to the provisions set forth in Sections 1 through 14 of the Promissory Notes.

105.    In the Promissory Notes, Bank of America represented to Plaintiffs and Class members both (a) that their 1099-MISC payments were qualifying "payroll costs," and (b) if at least 60% of their Loan proceeds were used to pay qualifying payroll costs, as defined in the Promissory Notes, then the Loans were forgivable under the PPP.  Specifically, the Promissory Notes define "average monthly payroll costs" to include "as applicable, copies of payroll processor records, payroll tax filings and/or ***Form 1099-MISC***."  (emphasis added).

106.    The Promissory Notes further represented that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs."  On June 5, 2020, the SBA increased the portion of the loan proceeds that could be used for non-payroll costs and still qualify for forgiveness to 40% from 25%.

107.    Plaintiffs and Class members were ready, willing, and able to perform—and indeed did perform—their obligations under the Promissory Notes.  In accordance with the terms of the Promissory Notes and rule change, Plaintiffs and Class members made payments of at least 60% of their Loan proceeds attributable to "qualifying payroll costs" as defined by the Promissory Notes.

108.    Plaintiffs and Class members spent the remainder of their loan proceeds for qualifying covered mortgage interest payments, covered rent payments, and covered utilities, in total comprising no more than 40% of their loan proceeds.

109.    Accordingly, as defined and represented in the Promissory Notes, the full loan amount was a Forgivable Amount.

110.    Nevertheless, when Plaintiffs and Class members sought forgiveness for the Loans, Bank of America refused to facilitate their applications for forgiveness and told Plaintiffs and Class members that despite the bank's prior representations and agreement, the Loans were not forgivable.

111.    Bank of America has breached the Promissory Notes in that the Promissory Notes explicitly represented that 1099-MISC payments were qualifying payroll costs under the Loan program when they were not.

112.    Bank of America also breached the Promissory Notes in that the Promissory Notes explicitly represented that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs," as Bank of America now seeks to collect amounts loaned pursuant to the terms of the Promissory Notes, including principal and interest that it previously represented to Plaintiffs and Class members were fully forgivable.

113.    Bank of America's guarantees in the Promissory Notes that the Loans were forgivable if all other requirements for forgiveness were met were material terms of the Promissory Notes.  The purpose of the PPP and loan forgiveness was to address the significant impact of the COVID-19 crisis, felt most critically by small businesses, and help those small businesses struggling financially, in part, from shutdowns and other restrictions from COVID-19 related regulations and orders, to keep their workforces employed and hire back laid off workers during the COVID-19 crisis.   As recognized by Congress, the SBA, and Bank of America, loan forgiveness was an integral and material element of the PPP loan program.

114.    As a direct and proximate result of Bank of America's material breach of the Promissory Notes, Plaintiffs and the Class have been damaged and will continue to incur additional damage and are entitled to compensation from Bank of America in the amount of their Loans that

were represented and guaranteed in the Promissory Note to be forgivable, but for which forgiveness was denied, along with any interest charged and collected on these Loans by Bank of America.

115.    Had Plaintiffs and Class members known that payments to 1099 Workers did not qualify for PPP loans and would not qualify for forgiveness under the PPP, they would not have applied and taken a Loan, would have reduced the amount of the Loan they applied for, and/or would have allocated their Loan funds differently.

116.    As a direct and proximate result of Bank of America's material breach of the Promissory Notes, Plaintiffs and Class members have been damaged, will continue to suffer additional damage, and are entitled to compensation from Bank of America for said damages in an amount to be proven at trial.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(ON BEHALF OF THE CLASSES**
**AGAINST BANK OF AMERICA)**

117.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 100 of this Complaint, and all other Counts pleaded herein, as if fully set forth herein.

118.    Plaintiffs and Class members and Bank of America have agreed to the terms and conditions of the Promissory Notes.

119.    The Promissory Notes are subject to the implied covenant of good faith and fair dealing that requires that Defendant would conduct business with Plaintiff and Class members in good faith, deal with them fairly in fulfilling its obligations pursuant to the Promissory Notes, and protect the contracting parties' reasonable expectations.

120.    Bank of America has breached the implied covenant of good faith and fair dealing in the Promissory Notes by (a) failing to comply with its obligations under the CARES Act and its affirmative representations to Plaintiffs and Class members to confirm and verify the eligible Loan amount using the tax documents submitted by Plaintiffs and Class members; (b) falsely and misleadingly representing to Plaintiffs and Class members that certain payments as reported on Forms 1099-MISC were forgivable qualified payroll costs, when they were not; and (c) refusing to submit forgiveness applications through the SBA portal on behalf of Plaintiffs and Class members.

121.    Had Plaintiffs and Class members known that payments to 1099 Workers did not qualify for PPP loans and/or would not qualify for forgiveness under the PPP, they would not have applied and taken a Loan, would have reduced the amount of the Loan they applied for, and/or would have allocated their Loan funds differently. Plaintiffs and Class members are entitled to compensation from Bank of America for said damages in an amount to be proven at trial.

122.    As a direct and proximate result of Bank of America's material breach of the covenant of good faith and fair dealing, Plaintiffs and Class members have been damaged, will continue to suffer additional damage, and are entitled to compensation from Bank of America for said damages in an amount to be proven at trial.

**COUNT III**
**COMMON LAW FRAUD**
**(ON BEHALF OF THE CLASSES**
**AGAINST BANK OF AMERICA)**

123.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 100 of this Complaint, and all other Counts pleaded herein, as if fully set forth herein.

124.    Plaintiffs assert this Count on behalf of themselves and the Class, or, in the alternative, on behalf of the State Subclasses, against Bank of America.

125.    As detailed herein, Bank of America made false or misleading statements to Plaintiffs and Class members in the Promissory Notes and in their advertisements concerning its PPP loans to potential borrowers: (a) that payroll expenses attributed to 1099 Workers were "qualifying payroll costs" for PPP loan qualification; (b) if at least 60% of the loan proceeds (from Loans calculated using payroll expenses attributed to 1099 Workers) were used to pay "qualifying payroll costs" as defined by the Promissory Notes, then the Loans were forgivable under the PPP; and (c) Bank of America would review loan applications and documentation to verify the qualifying loan amounts.

126.    Specifically, the Promissory Notes and advertisements to borrowers defined "average monthly payroll costs" to include "as applicable, copies of payroll processor records, payroll tax filings and/or *Form 1099-MISC*."  (emphasis added).

127.    The Promissory Notes further represented that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs," later changed to 40%.

128.    Bank of America also represented to borrowers in advertisements, solicitations, and in loan applications that Bank of America would review the paperwork submitted by borrowers and confirm their eligible loan amounts.  Bank of America implicitly represented that it was actually doing so—in some circumstances seeking additional paperwork in connection with loan applications, and in others, adjusting the total qualifying loan amount for which borrowers were eligible.

129.    Plaintiffs and Class members used no less than 60% of their loan proceeds for payroll costs as defined in the Promissory Notes and advertisements to borrowers.

130.    Plaintiffs and Class members spent the remainder of their loan proceeds for qualifying covered mortgage interest payments, covered rent payments, and covered utilities, in total comprising no more than 40% of their loan proceeds.

131.    As defined and represented in the Promissory Notes, the full loan amount was a Forgivable Amount.

132.    Nevertheless, when Plaintiffs and Class members sought forgiveness for the Loans, Bank of America informed them that their Loans are not forgivable, because, with complete disregard for the Promissory Notes, according to Bank of America, payroll expenses attributed to 1099 Workers were not qualifying payroll costs, and payroll expenses attributed to 1099 Workers are likewise not forgivable.  Thus, Bank of America's representations to the contrary were false and misleading.

133.    Bank of America knew its representations were false and intended that Plaintiffs and Class members rely on them.

134.    Plaintiffs and Class members justifiably and actually relied on Bank of America's representations because of Bank of America's superior knowledge concerning the PPP program, Bank of America's representations that it would confirm and verify the loan amounts and documentation, and Plaintiffs' and Class members' prior banking relationship with Bank of America as small business clients with a business lending and a business depository relationship.

135.    Because of Bank of America's superior factual knowledge, as compared with Plaintiffs and Class members, because Bank of America affirmatively represented that it would review loan documentation and confirm and verify the qualifying loan amounts, and because Bank

of America knew Plaintiffs and Class members were relying on Bank of America's superior knowledge, experience, and judgment, there existed a quasi-fiduciary relationship, if not an actual one, Bank of America was under a duty to exercise reasonable care to disclose to Plaintiffs and Class members such matters as Plaintiffs and Class members were entitled to know because of the relationship of trust and confidence between them.  Specifically, Bank of America was under a duty to exercise reasonable care to disclose to Plaintiffs and Class members before they signed the Promissory Notes both (a) that payroll expenses attributed to 1099 Workers were ***not*** "qualifying payroll costs" for purposes of qualifying for Loans, and (b) payments to 1099 Workers from loan proceeds were not qualifying payroll costs for purposes of forgiveness under the PPP.

136.    These false statements and misrepresentations were material to Plaintiffs' and Class members' decision to apply for and take out Loans, to apply for Loans in the amount that they did, and to determine how to use the Loan funds.

137.    Each Plaintiff decided to enter into the Promissory Notes based, in part, on (a) Bank of America's representations that (i) payroll expenses attributed to 1099 Workers were qualifying "payroll costs," and (ii) if at least 60% of the loan proceeds (from Loans calculated using payroll expenses attributed to 1099 Workers) were used to pay "qualifying payroll costs" as defined in the Promissory Notes, then the Loans were forgivable under the PPP; (b) the Promissory Notes' definition of "average monthly payroll costs," to include "as applicable, copies of payroll processor records, payroll tax filings and/or ***Form 1099-MISC***" (emphasis added); and (c) the Promissory Notes' representation that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs," which was later increased to 40%.

138.    Had Plaintiffs and Class members known that funds used to pay 1099 Workers would not qualify for PPP Loans or for forgiveness under the PPP, they would not have entered into the Promissory Notes, included payroll expenses attributed to 1099 Workers in their calculation of average monthly payroll costs, applied for and taken a Loan, and/or would have reduced the amount of the Loan they applied for, and/or would have allocated their Loan funds differently.

139.    Plaintiffs and Class members have suffered damages as a result of Bank of America's fraud.

**COUNT IV**
**FRAUD IN THE INDUCEMENT**
**(ON BEHALF OF THE CLASSES**
**AGAINST BANK OF AMERICA)**

140.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 100 of this Complaint, and all other Counts pleaded herein, as if fully set forth herein.

141.    Plaintiffs assert this Count on behalf of themselves and the Class, or, in the alternative, on behalf of the State Subclasses, against Bank of America.

142.    As detailed herein, Bank of America made false or misleading statements to Plaintiffs and Class members in the Promissory Notes and advertisements to potential borrowers concerning its PPP loans to induce them to take out the Loans with Bank of America, specifically: (a) that payroll expenses attributed to 1099 Workers were qualifying "payroll costs"; (b) if at least 60% of the loan proceeds (from Loans calculated using payroll expenses attributed to 1099 Workers) were used to pay "qualifying payroll costs" as defined in the Promissory Notes, then the Loans were forgivable under the PPP; and (c) Bank of America would review loan applications and documentation to verify the qualifying loan amounts.

143.    Specifically, the Promissory Notes and define "average monthly payroll costs" to include "as applicable, copies of payroll processor records, payroll tax filings and/or ***Form 1099-MISC***." (emphasis added).

144.    The Promissory Notes further represented that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs," later changed to 40%.

145.    Bank of America also represented to borrowers in advertisements, solicitations, and in loan applications that Bank of America would review the paperwork submitted by borrowers and confirm their eligible loan amounts. Bank of America implicitly represented that it was actually doing so—in some circumstances seeking additional paperwork in connection with loan applications, and in others, adjusting the total qualifying loan amount for which borrowers were eligible.

146.    Plaintiffs and Class members used no less than 60% of their loan proceeds for payroll costs as defined in the Promissory Notes.

147.    Plaintiffs and Class members spent the remainder of their loan proceeds for qualifying covered mortgage interest payments, covered rent payments, and covered utilities, in total comprising no more than 40% of their loan proceeds.

148.    As defined and represented in the Promissory Notes, the full loan amount was a Forgivable Amount.

149.    Nevertheless, when Plaintiffs and Class members sought forgiveness for the Loans, Bank of America informed them that their Loans are not forgivable, because, with complete disregard for the Promissory Notes, according to Bank of America, payroll expenses attributed to

1099 Workers were not qualifying payroll costs, and payroll expenses attributed to 1099 Workers are likewise not forgivable.  Thus, Bank of America's representations to the contrary were false and misleading.

150.    Bank of America knew its representations were false and intended that Plaintiffs and Class members rely on them, which, if erroneous, would cause Plaintiffs and Class members loss or injury.

151.    Plaintiffs and Class members actually and justifiably relied on Bank of America's representations because of Bank of America's superior knowledge concerning the PPP program, Bank of America's representations that it would confirm and verify the loan amounts and documentation, and Plaintiffs' and Class members' prior banking relationship with Bank of America as small business clients with a business lending and a business depository relationship.

152.    Plaintiffs and Class members also had a right to rely on Bank of America's representations in full belief of their truth because of Bank of America's superior factual knowledge, as compared with Plaintiffs and Class members, because Bank of America affirmatively represented that it would review loan documentation and confirm and verify the qualifying loan amounts, and because Bank of America knew Plaintiffs and Class members were relying on Bank of America's superior knowledge, experience, and judgment.  For the same reasons, there existed a quasi-fiduciary relationship, if not an actual one, Bank of America was under a duty to exercise reasonable care to disclose to Plaintiffs and Class members such matters as Plaintiffs and Class members were entitled to know because of the relationship of trust and confidence between them.  Specifically, Bank of America was under a duty to exercise reasonable care to disclose to Plaintiffs and Class members before they signed the Promissory Notes: (a) that payroll expenses attributed to 1099 Workers were *not* "qualifying payroll costs" for purposes of

qualifying for Loans; (b) payments to 1099 Workers from loan proceeds were ***not*** qualifying payroll costs for purposes of forgiveness under the PPP; and (c) that Bank of America would ***not*** review Plaintiffs' and Class members application and confirm eligible Loan amounts.

153.    Bank of America knew or should have known that had the truth been disclosed, Plaintiffs and Class members would not have signed the Promissory Notes.

154.    Each Plaintiff decided to enter into the Promissory Notes based, in part, on (a) Bank of America's representations that (i) payroll expenses attributed to 1099 Workers were "qualifying payroll costs," and (ii) if at least 60% of the loan proceeds (from Loans calculated using payroll expenses attributed to 1099 Workers) were used to pay "qualifying payroll costs" as defined in the Promissory Notes, then the Loans were forgivable under the PPP; (b) the Promissory Notes' definition of "average monthly payroll costs," to include "as applicable, copies of payroll processor records, payroll tax filings and/or ***Form 1099-MISC***" (emphasis added); and (c) the Promissory Notes' representation that "loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for non-payroll costs," which was later increased to 40%.

155.    Had Plaintiffs and Class members known that funds used to pay 1099 Workers did not qualify for PPP loans and/or would not qualify for forgiveness under the PPP, they would not have entered into the Promissory Notes, included payroll expenses attributed to 1099 Workers in their calculation of average monthly payroll costs, applied for and taken a Loan, and/or would have reduced the amount of the Loan they applied for, and/or would have allocated their Loan funds differently.

156.    Plaintiffs and Class members have suffered damages as a result of Bank of America's fraud.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**(ON BEHALF OF THE CLASSES**
**AGAINST BANK OF AMERICA)**

157.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 100 of this Complaint, and all other Counts pleaded herein, as if fully set forth herein.

158.    Plaintiffs bring this Count on behalf of themselves and the Class, or, in the alternative, on behalf of the State Subclasses, against Bank of America.

159.    Because of Bank of America's superior factual knowledge, as compared with Plaintiffs and Class members, because Bank of America affirmatively represented that it would review loan documentation and confirm and verify the qualifying loan amounts, and because Bank of America knew Plaintiffs and Class members were relying on Bank of America's superior knowledge, experience, and judgment, Bank of America was under a duty to exercise reasonable care to disclose to Plaintiffs and Class members such matters as Plaintiffs and Class members were entitled to know with regard to these affirmative representations.

160.    Specifically, Bank of America was under a duty to exercise reasonable care to disclose to Plaintiffs and Class members:  (a) that payroll expenses attributed to 1099 Workers were *not* "qualifying payroll costs" for purposes of qualifying for Loans; (b) payments to 1099 Workers from loan proceeds were *not* "qualifying payroll costs" for purposes of forgiveness under the PPP; and (c) that Bank of America would *not* review Plaintiffs' and Class members application and confirm eligible Loan amounts.

161.    Instead, Bank of America misrepresented to Plaintiffs and Class members in the Promissory Notes and its advertisements to borrowers concerning PPP loans: (a) that payroll expenses attributed to 1099 Workers were qualifying "payroll costs"; (b) if at least 60% of the loan proceeds (from Loans calculated using payroll expenses attributed to 1099 Workers) were used to pay "qualifying payroll costs" as defined in the Promissory Notes, then the Loans were forgivable under the PPP; and (c) Bank of America would review loan applications and documentation to verify the qualifying loan amounts.

162.    These misrepresented, concealed, and suppressed facts were material because a reasonable consumer would have expected, based on Bank of America's guarantees in its solicitations and the Promissory Notes, that the Loans were forgivable if all other requirements for forgiveness were met, and would rely on those facts in deciding whether to enter into the Promissory Notes.

163.    Bank of America knew that Plaintiffs and Class members would rely on its misrepresentations and statements, which, if erroneous, would cause Plaintiffs and Class members loss or injury.

164.    Each Plaintiff actually and justifiably relied on Bank of America's representations when each decided to enter into the Promissory Notes.

165.    But for Bank of America's misrepresentations, Plaintiffs and Class members would not have entered into the Promissory Notes, included payroll expenses attributed to 1099 Workers in their calculation of average monthly payroll costs, applied for and taken a Loan, and/or would have reduced the amount of the Loan they applied for, or would have allocated their Loan funds differently.

166.    As a direct and proximate result of Bank of America's failure to disclose and the misrepresentations, and Plaintiffs' and Class members' justified reliance thereon, Plaintiffs and Class members suffered damages.

**COUNT VI**
**NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**("NCDTPA"), N.C. GEN. STAT. §§ 75-1 ET SEQ.**
**(ON BEHALF OF THE NATIONWIDE CLASS**
**AGAINST BANK OF AMERICA)**

167.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 thought 100 of this Complaint, and all other Counts pleaded herein, as if fully set forth herein.

168.    Plaintiffs assert this Count on behalf of themselves and the Class, or, in the alternative, on behalf of the State Subclasses, against Bank of America.

169.    Bank of America was and is engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

170.    In the course of its business, Bank of America, through its agents and/or employees, violated the North Carolina Unfair and Deceptive Trade Practices Act ("NCDTPA") by willfully, knowingly, and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts, as described herein.

171.    Defendant has engaged in unlawful, unfair, fraudulent, deceptive and misleading business practices by violating the letter of the law and by employing business practices likely to deceive the public.

172.    Bank of America's conduct related to the Loans was unlawful because it was required under the CARES Act and the rules and regulations promulgated thereunder to verify and confirm eligible loan amounts under the PPP, excluding amounts reported on Form(s) 1099-MISC

that were paid to independent contractors, but it nevertheless included such payments, to the detriment of Plaintiffs and Class members.

173.    Bank of America has engaged in unfair business practices under the NCDTPA because Bank of America told Plaintiffs and Class members that forgivable qualifying payroll costs included amounts paid to independent contractors (as reported on Form(s) 1099-MISC).

174.    Under the NCDTPA, Bank of America has engaged in deceptive business practices because Bank of America's conduct was likely to deceive, and did actually did deceive, members of the public including Plaintiffs and Class members into calculating the amount of the Loans for which they qualified, applying for the Loans, and signing the Promissory Notes, which Plaintiffs and Class members believed—and were told by Bank of America in those Promissory Notes— were eligible for forgiveness.  In failing to disclose and omitting the fact that under the PPP, borrowers were not permitted to include amounts reported on Form(s) 1099-MISC in their calculation of "average monthly payroll costs for the calendar year 2019," and that amounts paid to independent contractors (as reported on Form(s) 1099-MISC) were not payroll costs, Bank of America violated the NCDTPA, and caused injuries to Plaintiffs and Class members.  Bank of America's omissions and acts of concealment pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

175.    Plaintiffs and Class members reasonably relied on Bank of America's representations that their payments to 1099 Workers were qualifying and forgivable payroll costs, particularly as Bank of America represented it would confirm and verify the qualifying loan amount and all borrower documentation.

176.    Bank of America had a duty of care not to give false or misleading information for the purpose of inducing Plaintiffs and Class members to apply for and obtain Loans from Bank of America, which it breached.

177.    A causal relationship exists between Bank of America's unfair, and/or deceptive conduct and the ascertainable losses suffered by Plaintiffs and Class members.  Had Plaintiffs and Class members known that funds used to pay 1099 Workers did not qualify for PPP Loans and/or would not qualify for forgiveness under the PPP, they would not have applied for and taken a Loan, would have reduced the amount of the Loan they applied for, and/or would have allocated their Loan funds differently.

178.    The injuries suffered by Plaintiffs and Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and Class members should have reasonably avoided.  Therefore, Bank of America also engaged in unfair practices.

179.    Plaintiffs seek an award of treble damages, restitution, and disgorgement of all monies and revenues generated by Bank of America as a result of such practices in an amount to be determined at trial according to proof, attorneys' fees and costs, and all other relief allowed under the law.

## COUNT VII
## DECLARATORY RELIEF
## UNDER 28 U.S.C. § 2201
## (ON BEHALF OF THE CLASSES
## AGAINST BANK OF AMERICA)

180.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 100 of this Complaint, and all other Counts pleaded herein, as if fully set forth herein.

181.    This claim for declaratory relief is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* ("Declaratory Judgment Act"), to declare the contract provisions in the Promissory Notes are valid and enforceable as written.  Specifically, Plaintiffs ask the Court to declare that (a) the Promissory Notes guaranteed 1099 Worker payroll expenses were "qualifying payroll costs"; (b) the Promissory Notes guaranteed the Loans (calculated based on 1099 Worker payroll expenses) would be subject to partial or complete forgiveness, including both interest and principal, if the borrower used some portion of the Loan proceeds on "qualifying payroll costs" and other qualifying non-payroll costs; and (c) Bank of America was required, as an underwriter under the PPP to confirm the qualifying dollar amount of average monthly payroll costs in underwriting and issuing PPP Loans.

182.    Bank of America maintains that payments to 1099 Workers are and were not qualifying payroll costs and thus such amounts are not forgivable.

183.    Bank of America further maintains that it had no responsibility to verify qualifying loan amounts.

184.    These issues present an actual, judicable controversy between the parties relating to whether the contract provisions in the Promissory Notes are valid and enforceable as written.

185.    Plaintiffs and Class members have a right to have the contract provisions in the Promissory Notes declared valid and enforceable as written.

186.    As a result of the foregoing, Plaintiffs, on behalf of themselves and the Classes, seek (a) a declaratory judgment declaring the Promissory Notes guaranteed 1099 Worker payroll expenses could be used to calculate Plaintiff and Class members' "qualifying payroll costs"; (b) the Promissory Notes guaranteed the Loans (calculated based on 1099 Worker payroll expenses) would be subject to partial or complete forgiveness, including both interest and

principal, if the borrower used some portion of the Loan proceeds on "qualifying payroll costs" and other qualifying non-payroll costs; and (c) Bank of America was required, as an underwriter under the PPP to confirm the qualifying dollar amount of average monthly payroll costs in underwriting and issuing PPP Loans.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the other Class members, respectfully request that this Court enter judgment in their favor and against Bank of America by:

A.    Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, declaring that Plaintiffs are proper Class representatives, and appointing Plaintiffs' attorneys as class counsel;

B.    Granting permanent injunctive relief to prohibit Bank of America from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    Awarding Plaintiffs and the other Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D.    Adjudging and declaring that the unlawful acts, omissions, and practices described herein constitute breach of contract, breach of the covenant of good faith and fair dealing, and violations of the North Carolina Deceptive Business Practices Act ("NCDTPA"), N.C. Gen. Stat. §§ 75-1 *et seq*.;

E.    A declaration that the Promissory Notes guaranteed 1099 Worker payroll expenses could be used to calculate Plaintiff and Class members' "qualifying payroll costs";

F.    A declaration that the Promissory Notes guaranteed the Loans (calculated based on 1099 Worker payroll expenses) would be subject to partial or complete forgiveness, including both interest and principal, if the borrower used some portion of the Loan proceeds on "qualifying payroll costs" and other qualifying non-payroll costs;

G.      A declaration that Bank of America was required, as an underwriter under the PPP to confirm the qualifying dollar amount of average monthly payroll costs in underwriting and issuing PPP Loans;

H.      Ordering disgorgement and restitution of all earnings, profits, compensation, and benefits received by Bank of America as a result of its unlawful acts, omissions, and practices described herein;

I.       Ordering an award of treble damages, restitution, and disgorgement of all earnings, profits, compensation, and benefits received by Bank of America as a result of its unlawful acts, omissions, and practices described herein, and all other relief allowed under the NCDTPA;

J.       Awarding statutory, punitive, and exemplary damages to the fullest extent permitted by law;

K.      Awarding Plaintiffs and the other Class members the costs and disbursements of this action, along with reasonable attorneys' fees and expenses, to the extent permitted by law;

L.      Awarding pre- and post-judgment interest at the maximum legal rate; and

M.      Granting all such other relief as the Court deems just and proper.


Dated: August 19, 2022                          Respectfully submitted,

                                                **GRANT & EISENHOFER P.A.**

                                                By:  */s/ Suzanne Sangree Bar No. 26130*

                                                Kelly L. Tucker (*pro hac vice* to be filed)
                                                ktucker@gelaw.com
                                                Suzanne Sangree
                                                ssangree@gelaw.com

Laina M. Herbert (*pro hac vice* to be filed)
lherbert@gelaw.com
123 S. Justison Street, 7th Floor
Wilmington, DE  19801
Tel. (302) 622-7000
Fax. (302) 622-7100

**MILLER SHAH LLP**
James C. Shah (*pro hac vice* to be filed)
jcshah@millershah.com
Natalie Finkelman Bennett (*pro hac vice* to be filed)
nfinkelman@millershah.com
1845 Walnut Street, Suite 806
Philadelphia, PA  19103
Tel. (866) 540-5505
Fax. (866) 300-7367

Nathan C. Zipperian (*pro hac vice* to be filed)
nczipperian@millershah.com
1625 N. Commerce Pkwy, Suite 320
Fort Lauderdale, FL  33326
Tel. (866) 540-5505
Fax. (866) 300-7367

*Counsel for Plaintiffs and the Putative Class*